## HITCHCOCK v. VALLEY CAMP COAL CO. et al.

(District Court, W. D. Pennsylvania. January 11, 1926.)

No. 347.

1. Patents ⊜17—Ingenuity and mechanical ability not accomplishing something new will not support patent.

Ingenuity and mechanical ability, however great, will not support valid patent unless result is to give something new to the world.

2. Patents ⊜23—Omission of element of device may constitute invention where same functions performed.

Invention may exist in omission of an element of a device, but only when remaining elements have been so arranged that they perform all the functions of original machine.

3. Patents ⊜328—935,205, for railroad frog, held invalid.

Hitchcock patent, No. 935,205, for a railroad frog, *held* invalid.

In Equity. Patent infringement suit by Halbert K. Hitchcock against the Valley Camp Coal Company and another. Bill dismissed.

Christy & Christy, of Pittsburgh, Pa., for plaintiff.

Allen & Allen, of Cincinnati, Ohio, and Clarke & Doolittle, of Pittsburgh, Pa., for defendants.

GIBSON, District Judge. The plaintiff charges infringement by defendants of letters patent No. 935,205, for a railway frog, granted September 28, 1909. The application was filed July 10, 1906.

The defendants allege that the claims of the Hitchcock patent are invalid and void because involving no new structure in railway frogs in view of the prior art and prior use.

The plaintiff relies upon Claims 3, 7, and 10 of the patent, which are as follows:

"3. A railway track structure having at one end two arms against which two rails are detachably secured and which fit the said rails between the top and bottom flanges and have a projection extending up along the side of the head of the rail to the top thereof, the said projection being provided with inclined surfaces adapted to gradually receive the weight of the wheels traveling thereover, the said arms forming the only means of keeping the rails in alinement with the parts of the track structure with which the rails are supposed to register."

"7. A railway track structure having at one end two arms which rest on the top of the bottom flange of the rails and extend up along the side of the top flange of said rails approximately to the top thereof and having their top surfaces inclined toward the body of the structure, substantially as set forth."

"10. A frog heel rail having at one end an arm which rests on the top of the bottom flange of the rail to which it attaches and extends up along the side of the top flange of said rail approximately to the top thereof and having its top surface inclined toward the frog of which it forms a part, substantially as set forth."

A wooden model has been admitted in evidence, with the formal admission of defendant that it is an accurate wooden reproduction of track frogs which have been manufactured and sold by the defendant Weir Frog Company, and by it furnished to the other defendant, the Valley Camp Coal Company. An examination of the model makes it plain that it is substantially described by the claims of the patent upon which plaintiff relies. From this conclusion, manufacture and use of the frog being admitted, it follows that plaintiff is entitled to the decree sought if the claims of his patent are valid.

Plaintiff's history of his frog is, in substance, that in the fall of 1904, and for some months thereafter, he was located at Creighton, Pa., and was engaged in certain investigations and experiments relating to abrasives in connection with the plate glass industry. While so engaged, his attention was called to certain difficulties of the Creighton Coal Company incident to the recent replacement of mules by a small electric locomotive as the motive power for conveying the coal from the workings in the mine to the tipple. Under the conditions of operation in the Creighton mine, the wheels of the locomotive quickly became so worn in the middle of their treads that false flanges on the outside of the wheel were created and soon became almost as large as the true flanges on the inside of the wheels. The result, with the frogs or their equivalents then in use in the mine, was that these false flanges on the wheels would grip the outer side of the rail and the

wheel would strike the point of the frog and derail the train. To meet this difficulty, the plaintiff evolved the frog which he later patented. This frog was a one-piece cast construction containing four arms, two at the heel and two at the toe of the frog proper. Each of these arms fitted into the outer part of the connecting rail between its top and bottom flanges and was bolted to the rail, thus providing a juncture sufficiently strong for the plaintiff's purpose in view, and reduced the shock occasioned by the passage of the wheels over the point of juncture of the rail with the frog. The trouble occasioned ·by the false flanges was met by making each arm of the solid frog of a width greater than was needed to fit the outside of the connecting rail between its top and bottom flanges, and the part extending beyond the outside of the rail was inclined upward from the end of the arm toward the main body of the frog, gradually attaining the level of the main part. By this means the true flange was enabled to grip the inside of the rail tread, and the false flange was led up to the level of the main frog without jar, and was kept from striking the toe of the frog in a wrong way.

[1] The frog evolved by the plaintiff quite satisfactorily met the demands upon it in the Creighton mine. If constructed without assistance from the prior art—and the Patent Office file in the patent in suit is rather convincing as to the plaintiff's lack of knowledge of previous railway frog patents—it exhibited considerable ingenuity and ability in overcoming mechanical difficulties. But ingenuity and mechanical ability, however great, are not to be rewarded by a valid patent unless the result of them is to give something new to the world. Independent discovery of the same device given to the public at an earlier period by another avails nothing; and this, at its best, is the situation of the plaintiff, as we find. This conclusion is based upon an examination of prior patents and testimony offered by defendants indicating prior public use of railway frogs identical with plaintiff's frog in all features resulting from the exercise of invention.

A number of patents have been offered in evidence by defendants to establish their claim that all the features of plaintiff's frog were known by those acquainted with the prior art at the time application was made for the patent in suit. We shall refer to only a few of them. An examination of the Pierce patent, No. 276,070, granted April 17, 1883, will disclose the fact that it is identical with the frog shown by the patent in suit, with the exception of but one important feature. The Pierce patent did not show the inclined plane on the outside of the projecting arms of the frog designed to prevent the false flange on the outside part of the wheel tread from striking the toe of the frog and thus derailing the train. This feature of the Hitchcock patent was anticipated, however, by the Nichols patent, No. 631,808, granted August 29, 1899. See Fig. 4, second sheet, which shows the false flange and the action of the invention. This construction was in common use in 1905. With the exception of this clearly anticipated feature, the claim of the Hitchcock patent in suit is met by the Pierce frog. It is true, the third claim of plaintiff's patents set forth "the said arms (of the frog) forming the only means of keeping the rails in alinement with the parts of the track structure with which the rails are supposed to register." The plaintiff contends that by this clause his device is distinguished from the Pierce frog, because the latter calls for a fish-plate in addition to the arm portion of the frog that supports the connecting rail at the juncture point. The fish-plate, as a strengthening device, dates back almost to the time of Tubal Cain, and that the mere omission of one at a junction point should constitute invention is inconceivable. The mere alinement of the rails is secured by the Pierce patent, minus its fish-plate, in just the same manner as are the rails in the patent in suit. An examination of the Pierce patent will show that the patentee designed the use of the fish-plate, not for purposes of alinement, but simply to strengthen the joint. He stated:

"In order to make this joint stronger and more rigid, I apply to the joint on the inside, or on that side of the rail on which the flanges of the wheels pass, a fish-plate, $C$, passing the bolts $b$ through it as well as through the rail and wing or extension $a$. The fish-plate may be either a flat strip of metal or may be cast or forged to fit the form of the rail, as is now done with other fish-plates."

[2] It will be remembered that the Pierce device was intended to withstand the strain of fast and heavy surface railroad traffic, and that plaintiff's frog, although the patent does not so state, was primarily designed to take care of the comparatively light traffic of the mine. Invention may exist in the omission of an element of a device, but only when the remaining elements have been so arranged that they perform all the functions of the original machine. If both the element and its

function are absent from the new construction, no invention can be claimed; and this is particularly true when a simple reinforcing device such as a fish-plate, or base-plate, is omitted.

As stated, we cannot accede to the contention that invention exists in the patent in suit because the arms of the frog provide the only means of keeping the connecting rails in alinement, while the Pierce patent, also having similar arms, makes use of a fish-plate. Were we to accept the proposition, however, we still should be compelled to deny the validity of the patent based on the alinement feature, because this feature was anticipated by the Jeffrey patent, No. 240,519, granted April 26, 1881. By the drawing in the latter patent a wide-angled frog is disclosed, having four arms, to which the connecting rails are attached by bolts, without a fish-plate. The arm of the frog in part rests upon the bottom flange of the rail, but does not support the top flange of the rail, as do both the Pierce and Hitchcock patents; nor does it have the part of the arm outside of the rail inclined to prevent trouble on account of the false flange, as does the patent in suit. The patentee described the drawing of the Jeffrey patent as follows: "In the accompanying drawing, A represents the cross, cast or forged in one piece, so that the limbs of the cross project at any angle suitable for the tracks."

The claim is as follows: "A crossing frog composed of one piece of metal, cast or forged in the form of a cross, having the parts of its members at their intersection formed to serve as track rails, and their ends serving as splice-plates with the track rails, in combination with the track rails, substantially as herein set forth."

Counsel for the plaintiff has endeavored, in addition to the fish-plate distinction, to distinguish the Pierce frog from that of plaintiff by pointing to the fact that the drawing of the Pierce device represents a long, small-angled frog, and thus suitable only for surface railroads, while the plaintiff's drawing represents a wider-angled frog which was adapted for mine use. This contention is without weight, we think. An examination of the respective applications and claims of the patentees will disclose that Mr. Hitchcock did not confine his claims to a wide-angled frog and mine use; nor did Mr. Pierce limit his claims to a small-angled frog and surface use. It would not have been possible to base a demand for a patent upon mere locality of use. Nor could invention be founded upon the mere widening of the angle of a frog, because frogs of various angles to meet various conditions were manufactured and used long before the patent in suit was granted. Common knowledge, as well as testimony in this case, tells us that the wider its angle, the shorter the frog.

Looking at the matter from the standpoint of the history of the art, as it appears from prior patents, the patent in suit was a mere adaptation of several well-known elements of frog construction wherein each element performed the same function, and only the same, that it had been designed to perform in the prior patent wherein it was claimed.

It is established by the testimony that a frog embodying all the essential elements of plaintiff's construction, in our opinion, was in public use for some six years before plaintiff filed his application for patent. William Wharton, Jr., & Co., Inc., in 1898, to try out the wearing qualities of manganese steel, placed a certain frog on the tracks of the Pennsylvania Railroad Company near its Broad Street Station at Philadelphia. This frog remained in position until 1904. It differed from plaintiff's frog only in being small-angled rather than wide-angled, and was attached to a base-plate and had fish-plate reinforcements at the points of junction with the rails. It had the extending arms, the identical method of juncture with the rails, and the inclined portion of the arm designed to prevent trouble arising from false flanges on the wheels. This construction was advertised, with an engraving of a photograph of it, in Wharton & Co.'s catalogue published at least two years before plaintiff's patent was granted. As hereinbefore stated, in effect, in discussion of the Pierce patent, No. 276,070, we are of opinion that the omission of the mere strengthening devices of a frog in use on a surface railroad, or the widening of its angle, when such devices were unnecessary in mine use, did not constitute any invention.

[3] Finding, as we do, that the claims of plaintiff's patent are invalid and void because they disclose no new construction in railway frogs in view of the prior art and prior use, it follows that plaintiff's bill must be dismissed.

Let a decree be drawn in accordance with the foregoing opinion.